# IN THE COURT OF APPEALS OF IOWA

No. 22-1676
Filed April 12, 2023

**RACHEL ERIN WAGNER,**
    Plaintiff-Appellee,

**vs.**

**DYLAN JAMES BERNS,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Clayton County, Laura Parrish, Judge.

Dylan Berns appeals the district court's ruling granting Rachel Wagner physical care over their child. **AFFIRMED.**

Dana A. Judas of Nazette, Marner, Nathanson & Shea LLP, Cedar Rapids, for appellant.

Jeffrey E. Clements, Spirit Lake, for appellee.

Considered by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

Addressing his hope to be more involved in his child's life, Dylan Berns contends the district court should have resolved the physical-care question posed at trial by ordering joint physical care or, in the alternative, should have given him more visitation time with his and Rachel Wagner's two-year-old child. Based on our de novo review, we affirm the district court's order.

**I. Background Facts and Procedure.**

After dating for several years, these parents moved in together in 2019, they had their child in 2020, and, by 2021, they separated. Rachel petitioned for custody, placement, visitation, and support in September 2021, asking for joint legal custody with placement of physical care of the child with her. In his answer, Dylan agreed with joint legal custody but requested joint physical care. Each parent framed their requests for the court with specific detail. Rachel advocated for physical care in her with Dylan exercising visitation every other weekend from Friday at 5:00 p.m. until Sunday at 5:00 p.m. and an overnight every Tuesday night from 3:00 p.m. to 8:00 a.m. on Wednesday. As for Dylan's position, he requested a joint physical care schedule, where the parents would transfer care on a two-two-three rotation.

At the time of trial, both parties were in their late twenties and lived relatively close to each other in Clayton County. Rachel works as a sonographer at a hospital, which allows her a work schedule where she works from 7:30 a.m. until 5:00 p.m. on Monday, Tuesday, Thursday, and Friday each week. In the year before the trial, Rachel earned more than $64,000. Dylan, on the other hand, has a more variable schedule, which became part of the focus during the trial

testimony. Dylan's schedule required him to work odd hours and be gone late evenings. His livelihood is derived from several jobs. As the main source of income, Dylan engages in a family crop farming operation. To supplement that income, he also drives a semi-truck hauling livestock and chickens, although he had stopped taking overnight hauling jobs before the trial. Dylan had started a drone business but it had not taken off. He earns just more than $100,000 annually.

Their young child attends day care every week day, but since separation, Dylan had flexibility with his work to pick up the child from day care and keep her for about two hours until Rachel finished her work schedule for the day. Along with that time together, Dylan exercised visitation one overnight every other weekend and, starting around February 2022, Dylan cared for the child on an overnight schedule every Thursday. Rachel characterized her work schedule as more steady, thus more consistent for the child. Dylan's schedule was not as predictable given the nature of his work, which he acknowledged during the trial, but noted he had tried to remedy that issue. Rachel maintained at trial that she handled the majority of care for the child, including all of the meals and medical appointments and that she was the one who covered when the child was sick.

The parties could not agree on how physical care should work, so they proceeded to a trial in May 2022. After hearing evidence from both sides, the district court landed on joint legal custody with physical care in Rachel but provided Dylan visitation every other weekend from Friday at 5:00 p.m. until Sunday at 3:00 p.m. and, on the week he does not have the weekend, visitation with the child overnights on Tuesday and then again on the Thursday from 3:00 p.m. until

8:00 a.m. the next morning. Dylan moved for reconsideration of the physical-care determination but also urged the district court to add more time to his caretaking schedule, including requiring Rachel to allow him to continue the daily pickup from daycare. Although the district court denied Dylan's motion, it voiced a belief that based upon Rachel's testimony Dylan will have more frequent contact than the minimum visitation schedule provided in the order. Dylan appeals from that decision.

## II. Standard of Review.

Our review of the physical-care decision in this action between never-married parents is de novo. *Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005); *see also* Iowa R. App. P. 6.907. Especially when considering the credibility of witnesses, we give weight to the fact findings of the district court, but we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Physical care issues are not to be resolved based upon perceived fairness to the [*parents*], but primarily upon what is best for the *child*." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

## III. Analysis.

With the primary goal focusing on what is best for the child, we start with Dylan's claim that a joint physical care schedule should have been ordered. *See id.* at 695–96 (noting the controlling consideration is the best interests of the child). "[T]he main distinction between joint physical care and primary physical care with liberal visitation rights is the joint decision making on routine matters required when parents share physical care." *In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007). In the determination over a physical-care award, courts will consider the factors listed in Iowa Code section 598.41(3) (2021). *See* Iowa Code § 600B.40(2)

(requiring the court to consider the factors in section 598.41(3) when making a physical-care determination for a child whose parents never married). When determining what physical-care arrangement is in the best interests of the child, we will consider "stability and continuity with an eye toward providing the [child] with the best environment possible for [the child's] continued development and growth." *Hansen*, 733 N.W.2d*.* at 700. If we determine "joint physical care is not in the best interest of the child[]," then "the factors of continuity, stability, and approximation are entitled to considerable weight" in choosing a caregiver. *Id.*

Here, the district court found that a joint physical care schedule was not in the best interests of the child because the "factors of stability, continuity and approximation weigh in favor of physical care being awarded to Rachel." While both parents here are suitable caregivers, our decision must turn on "four key considerations: (1) stability and continuity of caregiving; (2) the ability of [the parents] to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to which parents are in general agreement about their approach to daily matters." *In re Marriage of Geary*, No. 10-1964, 2011 WL 2112479, at *2 (Iowa Ct. App. May 25, 2011) (citing *In re Marriage of Hansen*, 733 N.W.2d 683, 696–99 (Iowa 2007)). Noting that the parties could communicate about parenting issues, the district court determined that the lack of conflict was more a result of Dylan not seeking a significant role in the decision making for the child. But like the district court, we have little evidence to review on the factor involving the parents' general agreement about their parenting approaches, and it appears from this record that Dylan simply relied upon Rachel to handle the majority of caretaking decisions. Thus, while Dylan and Rachel communicated

over the pick-up and drop-off details and were generally respectful to each other in those communications, the stability and continuity of care factor leads us to conclude that the abrupt change for the child in the schedule she has known for two years would not be in her best interests. We agree with the district court's assessment and conclude joint physical care is not appropriate here.

So, "[w]hen joint physical care is not warranted, the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights." *In re Marriage of Bain*, No. 07-0333, 2008 WL 4325499, at *2 (Iowa Ct. App. Sept. 17, 2008). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. Thus, the parent primarily responsible for physical care of the children often meets the *Hansen* factors and have a leg up on the other, though we examine each case's unique facts. *See Bain*, 2008 WL 4325499, at *3.

In Dylan's brief, he does not advocate for the role of primary caretaker and he acknowledges that until very recently his schedule has not allowed him to be as engaged as a parent in the day-to-day care, unlike Rachel. Instead, Dylan argues for more visitation time than the district court afforded him. Pointing to new conditions in his life as of the trial date, he testified that he had changed his schedule to allow more time in the evenings and had help from his family to minimize work conflicts from the farming operation. While all that may help, we rely on the district court's assessment of that promise and the past history of his choices as we cannot predict what the future may hold. *See In re Marriage of Brown*, 778 N.W.2d 47, 50 (Iowa Ct. App. 2009) (giving the trial court some

deference for making specific findings after having heard and seen the witnesses).

And while Dylan asserts the district court relied upon the past history too heavily,

we see a well-reasoned analysis of the main concerns the court had to consider.

The district court succinctly summarized its rationale for the custody and visitation

decision by noting:

> Neither party identified concerns about the care the other provides to [the child]. The dispute between them is really with regard to the amount of time that Dylan has actually provided care for [the child] historically and how often he'll actually be available to provide care in the future. Dylan's work hours are often unpredictable, depending on the season, and his trucking schedule has fluctuated since [the child's] birth. By comparison, Rachel's work schedule allows her to spend significant time with [the child] and also allows her the flexibility to be available to [the child] when she is ill, has appointments or other needs. While Dylan did have some responsibility for assisting in providing care for [the child] during the parties' relationship, his involvement was limited. Dylan disputes Rachel's characterization of him providing only five to 10% of the care, but he does not attempt to argue that he has ever provided 50% of the care. Rachel has been the parent primarily responsible for medical appointments. She is the only parent who has taken time off work to care for [the child] when she has been ill, and she has had primary responsibility for [the child's] daily care from the time of her birth. Recently, Dylan has attempted to make changes to his trucking schedule and he and his family members have added equipment to their farming operation that will hopefully limit the time that it takes to complete fieldwork. The specifics of Dylan's schedule, however, remain uncertain and it is unlikely he will have a stable schedule due to the nature of his employment.

Because the district court addressed the visitation by allowing Dylan a schedule

not significantly different than the schedule he had exercised since the separation,

we find no reason to deviate from that determination. In the end, we agree with

the district court's evaluation that Rachel has provided the majority of the child's

care and has the more stable and consistent schedule and as such, is the

preferable physical caregiver. We affirm the district court's award of physical care and the visitation schedule outlined in the order.

## IV. Conclusion.

We affirm the district court's award of physical care to Rachel and the court's established visitation schedule for Dylan.

**AFFIRMED.**